IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| THE ESTATE OF BERNICE L. JONES | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil No. PJM 10-181 |
| | * | |
| NMS HEALTH CARE OF | * | |
| HYATTSVILLE, LLC, et al. | * | |
| | * | |
| Defendants. | * | |

**MEMORANDUM OPINION**

David King, acting *pro se* on behalf of the Estate of Bernice L. Jones, has sued NMS Health Care of Hyattsville, LLC ("NMS"), Barbie's Assisted Living, and Barbie Powell, alleging various self-styled claims arising out of Jones's stay at NMS, her subsequent transfer to Barbie's Assisted Living, and her aftercare at Barbie's Assisted Living.[1]  NMS has filed a Motion for Summary Judgment [Docket No. 55], which King opposes.

For the reasons that follow, NMS's Motion for Summary Judgment will be **GRANTED IN PART** and **DENIED IN PART**.

**I.**

Bernice L. Jones, a native and lifelong resident of New York, had no spouse, partner, children, siblings, or other immediate family. Instead, she had a dedicated set of close friends with whom she spoke and visited regularly. In the early 2000s, as Jones advanced into her 70s, her health deteriorated, and she relied on one such friend, David King, to assist her with

---

[1] On July 6, 2011, a Suggestion of Bankruptcy was filed as to Barbie Powell and Barbie's Assisted Living such that an automatic stay as to legal proceedings against them took effect. Accordingly, to proceed against these Defendants, King would have to file a motion with the Bankruptcy Court to lift the stay.

managing certain household, financial, and medical responsibilities.[2]  King, for example, looked after Jones's cat, performed various odd jobs around her home, and assisted her with getting to and from regular dialysis appointments.

In 2007, Jones moved from Brooklyn, N.Y. to Washington, D.C. to live with her cousin, Lois Patterson.  While there, she became acquainted with Dennis Mace, a neighbor whom Patterson paid to maintain the house and to assist with household and personal tasks.  Throughout her time in Washington, Jones continued to maintain contact with her friends in New York, speaking with King and others several times each week.

In 2008, Jones became acutely ill and was admitted to Providence Hospital in Washington.  On May 19 of that year, she was discharged from Providence and admitted to NMS's St. Thomas More Nursing and Rehabilitation Center ("St. Thomas More") in Hyattsville, Maryland, for short term rehabilitation.  Because she herself was ill, Patterson was unable to visit Jones at St. Thomas More.  Mace, on the other hand, visited Jones nearly every day, bringing her clean clothes, taking her clothes to be laundered, and bringing her mail, reading materials, and other items she requested.  In addition to receiving regular visits from Mace, Jones remained in frequent telephone contact with several of her friends, including King, with whom she spoke on a daily basis.  King remained responsible for managing Jones's financial and other obligations in New York.

In June 2008, personnel at St. Thomas More began to arrange for the discharge of Jones from their facility.  Precisely what happened during this period is in dispute.

According to King, on June 4, 2008, Jones called him from an office phone at St. Thomas More and told him that "they [St. Thomas More] want you to tell me how much is in my

---

[2]  King was paid for certain of his services while others he did voluntarily, viewing them as favors for a friend.

[bank] account." Finding this odd, King asked Jones if anyone was listening to the conversation. Jones hesitated before answering, then indicated that indeed someone else was listening. King responded by telling Jones that her financial information was a private matter and that he would not disclose it while someone else was listening. He did say, however, that he would tell her whatever she wanted to know later when they could have a private conversation. Veronica Hilton, the St. Thomas More employee who was in fact standing by Jones during the conversation, then took the phone from Jones and told King that St. Thomas More would not be impeded from getting payment from Jones and discharging her or that it would turn the matter over to its attorney.[3] After this conversation, Hilton allegedly called Citibank in an attempt to extract information regarding Jones's bank account, but the bank refused to give her the information. At some point thereafter, Hilton allegedly transported Jones to Citibank in a wheelchair where Hilton asked the bank representative to issue a check from Jones's account in favor of St. Thomas More, asserting that King had been taking money from the account. For whatever reason, the bank declined to issue the requested check in favor of St. Thomas More, but otherwise froze Jones's account. Jones later told King that she herself never said anything to the teller while at the bank.

According to NMS's version of the events, as contained in its internal notes dated June 5, 2008, St. Thomas More personnel spoke with Jones about moving her to an assisted living facility upon discharge, then called King to discuss this decision and to obtain certain information regarding financial planning for Jones. But King, they say, refused to provide them with any information regarding Jones's finances.

---

[3] Hilton also allegedly told King that she had brought Jones from her room to place the call from Hilton's office because the phone in Jones's room was broken. King states, however, that he spoke with Jones on the phone in her room later that same day and they experienced no problems.

Several telephone conversations and written communications between King and Zachary Gray, the Administrator at St. Thomas More regarding these encounters followed. On June 6, 2008, King sent Gray a letter, stating that he had learned that a St. Thomas More staff member had placed an unauthorized call to Citibank seeking information about Jones's bank account. By letter dated June 9, 2008, Gray advised King that Jones was a competent individual who was trying to make plans for her scheduled discharge, and because King was refusing to provide relevant financial information about Jones to St. Thomas More or even to Jones herself, Jones had asked St. Thomas More to arrange for her to be transported to her bank so she could have King's name removed from her account as well as records designating him as her responsible party. That same day, King wrote Gray a note informing him that he had just gotten off the phone with Jones, who told him that St. Thomas More would be moving her to "Bobby's Place." King also wrote that Jones had reassured him that he was still her surrogate. In that capacity, King told Gray, he forbade St. Thomas More from moving Jones without first consulting with him. King also asked Gray for details of the proposed transfer, but, he says, when he expressed his concern over the impending transfer to Gray over the phone, Gray refused to cooperate or to provide him with any information as to precisely where Jones would be transferred, reiterating that Jones was competent and capable of making her own decisions.

On June 11, 2008, without informing King, St. Thomas More transferred Jones to Barbie's Assisted Living. Jones's discharge sheet from St. Thomas More indicated that the discharge instructions were explained to Jones, further indicated that she should return to St. Thomas More for dialysis, and finally set forth that she was being discharged with all her belongings. Although the discharge sheet contained a line for a signature by "Resident/Family," in Jones's case it remained blank.

For a considerable time after Jones departed St. Thomas More, none of her friends, including King, knew where she was. When Mace went to pay his regular visit to St. Thomas More, he found Jones's room empty. When he asked the nurses on the floor and the security officer at the front desk where she was, everyone said they thought she was still in her room. The staff at St. Thomas More suggested that Mace inquire of the social worker. The social worker, although aware that Mace had been visiting Jones regularly and bringing her clean clothing, told him she could not disclose Jones's location and that he would have to ask King. But King did not know where Jones was. Neither did Jones's cousin, Patterson, nor did any other of the various friends with whom Jones communicated regularly. For a period of weeks, no one either heard from Jones or knew how to reach her. During that time, King, Patterson, Patterson's nephew, and other friends of Jones's undertook a frantic search for her.

Eventually, in early August 2008, nearly two months after her discharge from St. Thomas More, one of Jones's friends, Vilma Ernest, learned from the Maryland Department of Mental Health and Hygiene that Jones was residing at Barbie's Assisted Living in Glenn Dale, Maryland, while also receiving dialysis at St. Thomas More. On August 6, King and Ernest went to visit Jones at Barbie's Assisted Living, where they found her to be confused, not knowing where she was, and not knowing how she got there.[4] Barbie Powell, the proprietor of Barbie's Assisted Living, told King that St. Thomas More had represented to her that Jones had no family or friends. Once they located her, King and Jones's other friends resumed telephone contact with her. King visited her at Barbie's Assisted Living again on October 18, 2008.

---

[4] King has made various allegations regarding the quality of Jones's treatment while at Barbie's Assisted Living—including that she was neglected and that checks were fraudulently drawn from her account. These claims are against Defendants other than NMS, *see supra* fn.1, and are not discussed in detail here.

-5-

In December 2008, King received a phone call from Washington Hospital Center in Washington informing him that Jones had been admitted to that facility, and in January 2009, the doctors told him that Jones was in a coma from which she would not awaken. King apparently made the decision to terminate life support on January 7, 2009. Jones died at age 80.

In time, this lawsuit ensued. It is now before the Court on NMS's Motion for Summary Judgment.

**II.**

Under Rule 56(a), summary judgment is appropriate when there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting FED. R. CIV. P. 56(e)). In considering a motion for summary judgment, the Court must "draw all justifiable inferences in favor of the nonmoving party." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson*, 477 U.S. at 255). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp.*, 477 U.S. at 323-24).

Although *pro se* pleadings are "held to less stringent standards than formal pleadings drafted by lawyers," *Haines v. Kerner*, 404 U.S. 519, 520 (1972), they "must still set forth facts sufficient to withstand summary judgment." *Symeonidis v. Paxton Capital Grp., Inc.*, 220 F. Supp. 2d 478, 480 n.4 (D. Md. 2002) (citations omitted).

### III.

The Court has previously determined that King has standing to bring claims on behalf of Jones's estate. The sole question before it at this juncture is whether he has adduced sufficient facts to survive summary judgment.

King has attempted to articulate five causes of action against NMS: (1) violation of Article 24 of the Maryland Constitution; (2) document forgery; (3) intentional infliction of emotional distress; (4) conversion; and (5) false imprisonment. King's first four claims can be disposed of with minimal discussion. However, as explained below, the Court finds that King has presented sufficient facts to support a claim of false imprisonment against NMS.

### A.

King's assertion that NMS's actions constitute a violation of Article 24 of the Maryland Declaration of Rights lacks a legal basis.[5] Although a plaintiff may bring a common law cause of action under this Article, *see Widgeon v. Eastern Shore Hosp. Center*, 300 Md. 520, 532, 479 A.2d 921, 927 (1984), he can only do so against "public officials" or "government agents," not against a private citizen. *Manikhi v. Mass Transit Auth.*, 360 Md. 333, 363-64, 758 A.2d 95, 111-12 (2000) (quoting *DiPino v. Davis*, 354 Md. 18, 50-51, 729 A.2d 354, 371 (1999) ("Maryland Constitutional provisions have the more narrow focus of protecting citizens from

---

[5] Article 24 of the Maryland Declaration of Rights provides: "That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

certain unlawful acts committed by government officials. Indeed, only government agents can commit these kinds of Constitutional transgressions.")). Since NMS is a private entity and not a public official or government agent, it cannot be liable for a violation of the Maryland Declaration of Rights.

**B.**

King's claim of document forgery—based on a handwriting expert report that concludes that certain documents purporting to bear Jones's signature were in fact signed by someone other than Jones—also fails.[6] Although in certain circumstances, forging or counterfeiting a document may be a violation of Maryland criminal law, *see, e.g.,* MD CODE, CRIM. LAW § 8-601, and evidence of forgery could, conceivably, be evidence of conversion or some other tortious activity, Maryland does not recognize a stand-alone civil action for document forgery, especially where, as here, King does not argue that any of the purportedly forged documents pertaining to NMS caused independent harm to Jones. No civil claim of document forgery against NMS can stand.

**C.**

King's claim for intentional infliction of emotional distress fares no better. To prove this tort, a plaintiff must demonstrate four elements: "(1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal

---

[6] The expert examined the following documents: (1) a check made out to Barbie Powell for $1,500 dated December 18, 2008; (2) a check made out to Barbie Powell for $1,500 dated January 2, 2009; (3) an arbitration agreement with St. Thomas More dated May 19, 2008; (4) an authorization to disclose medical records to St. Thomas More dated May 19, 2008; (5) a consent form to assign benefits and payments directly to St. Thomas More, dated May 19, 2008; and (6) a form acknowledging receipt of the Resident's Bill of Rights and Responsibilities issued by Neiswanger Management Services, dated May 19, 2008. Comparing the purported signature of Jones on these documents with known to be signatures of Jones, the expert determined that they all were forged.

connection between the wrongful conduct and the emotional distress; (4) The emotional distress must be severe." *Harris v. Jones*, 281 Md. 560, 566, 380 A.2d 611, 614 (1977). The tort of intentional infliction of emotional distress "is to be used sparingly and only for opprobrious behavior that includes truly outrageous conduct." *Kentucky Fried Chicken Nat'l Mgmt. Co. v. Weathersby*, 326 Md. 663, 670, 607 A.2d 8 (1992) (citing *Batson v. Shiflett*, 325 Md. 684, 734-35, 602 A.2d 1191, 1216 (1992); *Figueiredo–Torres v. Nickel*, 321 Md. 642, 653, 584 A.2d 69, 75 (1991); Restatement (Second) of Torts § 46 cmt. d (1965)).

NMS's conduct as alleged here, if proven, while certainly suspicious and problematic, would not be so "extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Harris*, 380 A.2d at 614 (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). Moreover, there is no evidence that Jones in fact experienced emotional distress so "severe" that "no reasonable man in civilized society should be expected to endure it." *Id.* at 617. At Barbie's Assisted Living, Jones's friends may have found her to be confused and not her usual self, but no evidence reasonably supports an inference that NMS intentionally caused Jones pain and suffering that would shock the conscience. The claim of intentional infliction of emotional distress proceeds no further.

**D.**

King's claim of conversion against NMS fails because he concedes that NMS took no money or property from Jones other than what, presumably, was lawfully owed for services rendered.[7] *See Travel Comm., Inc. v. Pan Am. World Airways, Inc.,* 91 Md. App. 123,

---

[7]  King does not challenge the quality of NMS's services, nor could he in any event state a claim for medical negligence absent expert testimony establishing a standard of care that NMS deviated from. *See Meda v. Brown*, 318 Md. 418, 428, 569 A.2d 202, 207 (1990).

183, 603 A.2d 1301, 1331 (1992) ("A claim for conversion requires proof of the following elements: (1) the plaintiff's right to possess the disputed property, and (2) an intentional taking of that property by a person without authority or permission.") (citing *Battista v. Savings Bank of Baltimore*, 67 Md. App. 257, 261, 507 A.2d 203 (1986)). Although there seems to be some suggestion of attempted conversion on the part of NMS, it comes to naught. *See Diamond v. T. Rowe Price Assoc., Inc.*, 852 F. Supp. 372, 410 (D. Md. 1994) ("Under Maryland law, mere temporary interference, absent damage to the rightful owner, is insufficient to establish conversion.") (citing *Yost v. Early*, 87 Md. App. 364, 388, 589 A.2d 1291 (1991), *cert. denied*, 324 Md. 123, 596 A.2d 628 (1991)).

The substance of King's conversion claim is directly solely at Barbie Powell and Barbie's Assisted Living. King alleges that Powell charged Jones thousands of dollars and made unauthorized personal purchases with Jones's bank card and forged Jones's signature on personal checks, occasioning a total economic loss of nearly $16,000. King contends that NMS is responsible for these losses because the losses were a consequence of the involuntary transfer of Jones to Barbie's Assisted Living. Even so, there is no evidence to suggest that NMS played any role in or even knew of the financial transactions between Jones and Barbie Powell or of the extent to which money may have lawfully been due for services rendered. *See Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249, 262, 841 A.2d 828, 836 (2004) ("At a minimum, a defendant liable of conversion must have 'an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights.'") (quoting *Keys v. Chrysler Credit Corp.*, 303 Md. 397, 414, 494 A.2d 200, 208 (1985)). Any claim of conversion that might exist would have to proceed against Barbie Powell and Barbie's Assisted Living; it does not lie against NMS.

**E.**

King's one claim that does pass muster is that for false imprisonment. King alleges that NMS falsely imprisoned Jones by forcibly and involuntarily transferring her to Barbie's Assisted Living. Having considered the record evidence, the Court finds that genuine disputes of material facts exist that preclude summary judgment in favor of NMS: namely, with respect to whether Jones in fact competently consented to be transferred from St. Thomas More to Barbie's Assisted Living.

To prove a claim of false imprisonment, a plaintiff must demonstrate three elements: "1) the deprivation of the liberty of another; 2) without consent; and 3) without legal justification." *Heron v. Strader*, 361 Md. 258, 264, 761 A.2d 56, 59 (2000) (citing *Manikhi v. Mass Transit Admin.*, 360 Md. 333, 364, 758 A.2d 95 (2000); *Montgomery Ward v. Wilson*, 339 Md. 701, 721, 664 A.2d 916, 925–26 (1995)). "To constitute a case of false imprisonment there must be some direct restraint of the person . . . Any exercise of force, or threat of force, by which in fact the other person is deprived of his liberty, compelled to remain where he does not wish to remain, or to go where he does not wish to go, is an imprisonment." *Mason v. Wrightson*, 205 Md. 481, 487, 109 A.2d 128, 131 (1954). Here the critical factual question is whether NMS obtained Jones's knowing and voluntary consent before discharging and transferring her to Barbie's Assisted Living. If it did not, a reasonable jury could find that the discharge and transfer constituted an unlawful deprivation of liberty, i.e., a false imprisonment.

King has adduced evidence that would support a finding that Jones did not voluntarily consent to be transferred to Barbie's Assisted Living. First and foremost, there is no documentary evidence of her consent. To the contrary, although the discharge sheet from St. Thomas More, which indicates that Jones will be transferred to Barbie's Assisted Living,

contains a space designated for a "Resident/Family Signature," Jones's consenting signature is glaringly absent. Furthermore, testimonial evidence might well warrant an inference that Jones did *not* consent—and may even have objected—to the transfer. She allegedly had told several friends that she wanted to go home upon being released from St. Thomas More and mentioned to at least one friend the possibility of hiring a home health aide to assist her, either at her apartment in New York or at Patterson's home in Washington, D.C. Jones, it may be noted, apparently had an insurance policy that would have covered her stay at an approved facility but did not, as it happened, cover the costs at Barbie's Assisted Living. Jones never told King or her other friends with whom she had frequent contact, that she knew anything about Barbie's Assisted Living or wanted to go there. In fact, the only time she mentioned it, she called it "Bobby's Place," indicating limited, if any, familiarity with the facility. When her friends finally located her there, Jones, they say, seemed confused, did not know where she was, nor how she got there. This evidence stands in sharp contrast to someone who knowingly and voluntarily consented to transfer.

There are additional problematic aspects of NMS's discharge and transfer of Jones. Maryland law requires health care facilities to provide notice and obtain express written consent prior to discharging or transferring residents. *See* MD. CODE ANN., HEALTH-GEN. § 19-345.1 (West 2012); MD. CODE REGS. 10.07.09.10, 11 (2011).[8] Where the resident has resided in the facility for fewer than 30 days, as Jones had, the facility must provide "reasonable notice of

---

[8] Subsection E of the resident transfer regulations, entitled "Documentation," provides: (1) In the event of a discharge or transfer of a resident, a nursing facility shall ensure that the following appears in the resident record: (a) The circumstances surrounding the discharge or transfer, including interventions initiated by the facility before proposing the discharge; (b) The notice described in §§C and D of this regulation; and (c) *If applicable, any express consent given by the resident or, when applicable, the resident's representative*. MD. CODE REGS. 10.07.09.10(E)(1)(c) (emphasis added).

the proposed discharge or transfer." MD. CODE ANN., HEALTH-GEN. § 19-345.1(e)(2); *see also id.* § 19-345.1(c)(2) (providing that the required notice go to "[t]he next of kin, guardian, or any other individual known to have acted as the individual's representative"). Additionally, a facility generally may not discharge or transfer a resident "[u]nless the resident or appropriate representative consented in writing to the discharge or transfer." MD. CODE REGS. 10.07.09.11(C)(1). Here there is strong evidence that NMS knew that King was Jones's representative; indeed it contacted King with respect to Jones's financial information.[9] Further, it is apparently undisputed that not only did NMS fail to provide King with notice or obtain his express written consent to the transfer; the evidence suggests that NMS knowingly defied King's express instruction not to transfer her without notifying him, then actively concealed the details of the transfer from him. King wrote to Gray that as Jones's surrogate, he forbade NMS from transferring Jones to "Bobby's Place," and demanded further details about the proposed transfer. Gray refused to provide the requested information, telling King that Jones was competent and capable of making her own decisions. NMS's efforts to keep King out of the transfer process lends further support to a finding that the transfer to Barbie's Assisted Living was involuntarily.

NMS, to be sure, argues that the evidence shows that, at all relevant times, Jones was competent and capable of making her own decisions. King acknowledges that he never sought to have Jones declared incompetent, nor did he attempt to remove her from Barbie's Assisted Living once he discovered her there. There is also no evidence to the effect that Jones requested to leave Barbie's Assisted Living once there. That said, however, some evidence of competence (as opposed to other evidence of incompetence) and an arguable failure to object to

---

[9] Whether the jury will credit Gray's assertion that Jones asked to have King's name removed from her bank account and from her records as her responsible party over King's contradictory testimony remains to be seen. Again, it may be noted that Gray's statement has no documentary support.

the transfer on Jones's part, are not tantamount to consent.  NMS identifies no incontrovertible evidence that Jones actually consented to the transfer.  *Cf. Fine v. Kolodny*, 263 Md. 647, 650, 284 A.2d 409, 410 (1971) (affirming directed verdict in favor of defendants on false imprisonment claim where the evidence showed that plaintiff *voluntarily admitted herself* to the hospital and was thereafter declared mentally incompetent); *Pounders v. Trinity Court Nursing Home*, 265 Ark. 1, 576 S.W.2d 934 (1979) (finding no evidence of a prima facie case of false imprisonment where plaintiff *consented* to go to the nursing home, was not physically confined to the nursing home, and chose not to leave because she did not have access to her shoes and had she nowhere else to go).

Drawing all reasonable inferences in favor of King, as at this stage it must, *see Anderson*, 477 U.S. at 255, the Court finds that a genuine dispute exists as to whether Jones knowingly and voluntarily consented to her transfer to Barbie's Assisted Living by St. Thomas More.  A reasonable jury could find that NMS forcibly moved Jones to a place "where [s]he [did] not wish to go" and that NMS deprived Jones of her liberty without her informed consent and without legal justification.  *Mason*, 109 A.2d at 131.  The claim of false imprisonment against NMS shall go forward; summary judgment on that count is denied.

### IV.

For the foregoing reasons, NMS Health Care of Hyattsville, LLC's Motion for Summary Judgment [Docket No. 55] is **GRANTED IN PART** and **DENIED IN PART**.

A separate Order will **ISSUE**.

                                                  /s/
                                 **PETER J. MESSITTE**
                       **UNITED STATES DISTRICT JUDGE**

**July 27, 2012**